UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:09·CR·296·1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL INFORMATION |
| | ) | |
| MARK DAVIS PRIDGEN | ) | |

THE UNITED STATES ATTORNEY CHARGES:

COUNT ONE
*Conspiracy to Make False Statements, to Make*
*Material False Statements, and to Commit*
*Mail Fraud and Wire Fraud*
*18 U.S.C. § 371*

INTRODUCTORY STATEMENT

1.   MARK DAVIS PRIDGEN, defendant herein, along with farmers, warehousemen, crop insurance adjusters, crop insurance agents, and others, worked together to defraud crop insurance companies of funds by filing false loss claims, to defraud the United States of America through the filing of false insurance claims ultimately reimbursed by the United States Department of Agriculture, to make material false statements in connection with the Federal Crop Insurance program, and to launder the proceeds and profits of the underlying fraud.

STATUTORY AND REGULATORY BACKGROUND

2.   In 1938, Congress passed the Federal Crop Insurance Act (hereinafter referred to as the "Act"), 7 U.S.C. § 1501 et seq., in

order to promote the economic stability of agriculture in the United States through, in part, a system of crop insurance.

3.     In furtherance of this purpose, Congress established the Federal Crop Insurance Corporation (hereinafter referred to as "FCIC"), 7 U.S.C. § 1503, which was authorized to insure crop losses due to drought, flood, or other natural disaster, as determined by the Secretary of United States Department of Agriculture (hereinafter referred to as "USDA"), 7 U.S.C. § 1508. Tobacco, corn, soybeans, and wheat were among the crops for which insurance was authorized under the Act.    7 U.S.C. § 1518.

4.     The Act only authorized the extension of insurance coverage to producers, that is, a person or entity with an insurable interest in a crop as either an owner-operator, landlord, tenant, or sharecropper.    7 U.S.C. § 1520.    Farmers are producers. A crop insurance policy under the Act provided payments to a farmer when bad weather (freeze, drought, etc.) or other such unavoidable events caused the harvest for the farm to be less than the amount specified in the insurance contract, or written policy agreement. The insurance contract or written policy agreement, and premiums of coverage, are based on four or more years of production records for a particular crop grown by a farmer on a specific farm designated by its unique Farm Serial Number ("FSN").

2

5. By delegated authority, the Secretary of USDA issued regulations governing the federal crop insurance program. 7 C.F.R. § 400 et seq.

6. Since 2004, farmers have been required to take out insurance policies prior to the growing season. Farmers generally do not pay their policy premiums until the growing season has ended and when the farmer knows whether or not his yield (i.e., the amount of crop harvested from a specific farm) justified an insurance claim. If the farmer makes a claim under his crop insurance policy, then the insurance premium is typically deducted from the amount paid out to farmer under the policy.

7. Under the crop insurance program, eligible farmers are paid benefits based, in part, on factual representations as to the amount of crop harvested and sold, and the cause of loss.

8. As statutorily mandated, the Secretary of USDA established the Risk Management Agency ("hereinafter referred to as "RMA"), an agency of the USDA, to supervise the FCIC and to administer all programs authorized under the Act. 7 U.S.C. § 6933.

9. By 1986, most crop insurance was sold through private insurance companies contracting with RMA. USDA reimbursed the private insurance companies for any claims paid in connection with crop losses covered by the federal crop insurance program.

10. The private insurance companies contracting with RMA must execute a Standard Reinsurance Agreement. See 7 C.F.R. §400.677.

3

11. The Standard Reinsurance Agreement requires that all insurance agents and agency employees are properly licensed by the State in which they are doing business.

## FACTUAL BACKGROUND

At all times relevant hereto,

12. MARK PRIDGEN, defendant herein, was a resident of Wilson, North Carolina.

13. From 1987 to 1992, MARK PRIDGEN, defendant herein, was a partner in Beaufort Leaf Tobacco Company, a partnership formed for the purpose of buying and selling tobacco.

14. During 1992, 1993, and 1998, MARK PRIDGEN, defendant herein, was an officer of Tobacco Insurance Agency, Inc.

15. Tobacco Insurance Agency, Inc. is a North Carolina Corporation, formed in 1992, for the purpose of selling crop insurance.

16. From 1999 through 2008, the wife of MARK PRIDGEN, defendant herein, was the President of Tobacco Insurance Agency, Inc. She also operated International Insurance & Properties, LLC from 2000 to 2009, which was engaged in rental and insurance businesses.

17. In 1998, MARK PRIDGEN, defendant herein, formed Pridgen Properties, LLC, for the purpose of engaging in agriculture business. Pridgen Properties, LLC was dissolved in 2002.

4

18. During 1998, MARK PRIDGEN, defendant herein, operated Bob Clark's Tobacco Warehouse and sold crop insurance.

19. MARK PRIDGEN held a license to sell insurance until December 1991. He thereafter continued to sell federal multi-peril crop insurance and private crop hail insurance through The Hallmart Agency, Inc., even though he did not hold a valid license to sell insurance in North Carolina.

20. The Hallmart Agency, Inc. was a North Carolina corporation, established in September 1990, for the purpose of selling insurance, including multi-peril crop insurance policies for, among other crops, tobacco, soybean, corn, and wheat, and in fact, sold crop insurance policies for such agricultural commodities. The Hallmart Agency, Inc. also sold crop-hail policies offered by private insurance companies. The Hallmart Agency, Inc.'s principal place of business was located at 3621 Airport Boulevard, Wilson, North Carolina.

21. MARK DAVIS PRIDGEN, defendant herein, received commissions earned on the policies he sold through The Hallmart Agency, Inc. The commission payments to him were disguised in that they were paid through business entities in his wife's name.

22. The Hallmart Agency, Inc, by and through its President/co-conspiring agent, did not disclose that MARK DAVIS PRIDGEN, defendant herein, was acting as a sub-agent on federal crop insurance policies. Nor did The Hallmart Agency, Inc.

5

disclose that MARK DAVIS PRIDGEN, defendant herein, was not licensed to sell insurance in North Carolina.

23. Between 2003 and 2006, The Hallmart Agency, Inc. paid Tobacco Insurance Agency, Inc. and International Insurance & Properties, LLC at least $429,790.57.

24. ARMtech Insurance Services was a subsidiary of American Agri-Business Insurance Company of Lubbock Texas, engaged in, among other things, the business of providing crop insurance services to the agriculture community. American Agri-Business Insurance Company, acting through ARMtech Insurance Services, contracted with the RMA to provide federally-backed multi-peril crop insurance policies. ARMtech Insurance Services executed a Standard Reinsurance Agreement with RMA. ARMtech Insurance Services also offered privately funded crop-hail insurance policies.

25. ARMtech Insurance Services contracted The Hallmart Agency, Inc., to act as a local independent insurance agent for multi-peril crop insurance policies and crop-hail insurance policies.

26. Rural Community Insurance Services (hereinafter referred to as "RCIS") was a subsidiary of the Rural Community Insurance Company of Anoka, Minnesota, engaged in, among other things, the business of providing crop insurance services to the agriculture community. RCIS contracted with the RMA to provide federally-

6

backed multi-peril crop insurance policies. RCIS executed a Standard Reinsurance Agreement with RMA.

27. RCIS contracted The Hallmart Agency, Inc., to act as a local independent insurance agent for multi-peril crop insurance policies.

## THE CONSPIRACY

28. Beginning on or about December 19, 2003, the exact date being unknown, and continuing up to and including December 15, 2008, within the Eastern District of North Carolina and elsewhere, defendant herein, MARK DAVIS PRIDGEN, did combine, conspire, confederate and agree with others known and unknown to the United States Attorney to commit offenses against the United States, to wit:

   a.  to knowingly make false statements and reports for
       the purpose of influencing in any way the action of
       the FCIC, and companies the FCIC reinsures, upon an
       application, advance, commitment, loan, insurance
       agreement, application for insurance and a
       guarantee, and any change or extension of any of
       the same, by renewal, deferment of action and
       otherwise, in violation of Title 18, United States
       Code, Section 1014;

   b.  in a matter within the jurisdiction of the Federal
       Crop Insurance Corporation, an agency within the
       United States Department of Agriculture, a
       department of the executive branch of the United
       States, in connection with the Federal Crop
       Insurance Program, to knowingly and willfully: (i)
       falsify, conceal, and cover up by any trick, scheme
       and devise, a material fact; and (ii) make
       materially false, fictitious, and fraudulent
       statements and presentations; and (iii) make and
       use any false writing and document knowing the same
       to contain materially false, fictitious, and

7

fraudulent statements, in violation of Title 18, United States Code, Section 1001;

c.  having devised and intending to devise any scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme or artifice and attempting to do so, to place in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, and to knowingly cause to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, in violation of Title 18, United States Code, Section 1341; and

d.  having devised and intending to devise any scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, or promises, to transmit and cause to be transmitted by means of wire in interstate commerce, that is, by electronic mail and facsimile, writings, signals and sounds, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

29.  It was the purpose of the conspiracy to profit through the filing of false and fictitious insurance claims, the sale of "hidden" tobacco, the payment of premiums as deductions from loss claim pay-outs, and the growth of The Hallmart Agency, Inc.'s business.

## MANNER AND MEANS

30.  In furtherance of the conspiracy, defendant herein, MARK DAVIS PRIDGEN, along with others, employed the following manner and means:

8

a.  The conspirators recruited farmers to take out insurance policies through The Hallmart Agency, Inc., promising farmers that another conspirator would make sure the farmer collected enough on claims to at least pay any premium due.

b.  The conspirators further succeeded in recruiting farmers to enter the scheme by, in part, assuring the farmer of a profitable insurance claim regardless of whether or not the farmer actually suffered any crop loss.

c.  MARK DAVIS PRIDGEN and other co-conspirators then worked with the farmers to make false crop insurance claims, and to hide some or all of their tobacco production by selling it in nominee names or for cash to co-conspiring warehousemen.  The co-conspiring farmer profited under the scheme because he was paid twice for each pound of tobacco: once through the false crop insurance claim, and also through the sale of the "hidden" tobacco. Other co-conspirators profited through other aspects of the double sales scheme, including the original insurance commission, collecting a share of the hidden tobacco's second sale, and profit margins derived from subsequent sales to larger tobacco companies.

d.  MARK DAVIS PRIDGEN and other co-conspirators misrepresented the truth of farm operations in a variety of documents that were submitted to RMA and private entities.  For example, documents, including applications, reports of actual production history, acreage reports, and claim forms made and

9

submitted in support of crop insurance coverage and claims, failed to truthfully show who had an insurable interest and who really suffered a loss and the extent of that loss.

      e.    To obtain crop insurance policies and to have more favorable coverage and rates for these policies, MARK DAVIS PRIDGEN and other co-conspirators repeatedly provided false information about the history of their production on particular farms, and would "back-date" the dates they submitted their insurance applications, policy change forms, and other supporting documentation.

      f.  A co-conspiring insurance agent further assisted co-conspiring farmers in making successful false crop insurance claims by (i) arranging for a corrupt insurance adjuster to falsely assess the scope of any damage claim, and (ii) directing the farmer and/or adjuster to misstate facts material to the claim, including, for example, the farmer's true tobacco production on a particular acreage.

      g.    A co-conspiring insurance agent further assisted co-conspiring farmers in making successful false crop insurance claims by fabricating, or causing to be fabricated, weight tickets. The false weight ticket would be submitted as supporting documentation with loss claims, and would purport to reflect the amount of crop the farmer successfully harvested from a particular farm.

10

h.    A co-conspiring insurance agent further assisted co-conspiring farmers in making false crop insurance claims, by, in some instances, falsely allocating loss and harvest amounts on Production and Yield Reporting Forms and Production Worksheet reports.  That is, to fraudulently establish losses on some insured farms, a co-conspiring insurance agent and other co-conspirators engaged in a practice of "yield shifting" that is, falsely reporting that the farmer had harvested very small quantities from the insured farms, falsely reporting much larger production per acre from other farms,  and falsely reporting less total production from all farms than was actually harvested.

i.    A co-conspiring insurance agent further made payments to an adjuster for the adjuster's role in facilitating the false claims, and disguised those payments in the books and records of The Hallmart Agency, Inc.

j.    MARK DAVIS PRIDGEN and others further directed non-farmers to take out tobacco production contracts as a vehicle to sell the tobacco co-conspiring farmers had hidden or would hide from their crop insurance claims.  MARK DAVIS PRIDGEN and others further directed the payment of co-conspirators' shares of sale of the hidden tobacco, including payments to the non-farmer for the use of non-farmer's name.

k.    A co-conspiring insurance agent further assisted co-conspiring farmers by aligning them with tobacco warehousemen that

11

were willing to buy hidden tobacco with checks made out in nominee names and for cash.

l.    A co-conspiring insurance agent further assisted co-conspirators by directing and allowing them to cash checks made out to false payee names, at his check cashing business.

m.    To further facilitate the filing of false claims, the conspirators forged the signatures of various farmers on Powers of Attorney.  The false Powers of Attorney purported to grant a co-conspiring insurance agent the authority to make claims for indemnity and to sign proof of loss production worksheets, both of which were prohibited under the SRA's Conflict of Interest rules applicable to The Hallmart Agency, Inc. as a contractor for ARMtech Insurance Services and RCIS.

n.    In some instances, the conspirators forged the signature of the farmer on loss claims forms and related supporting documentation.

o.    The Hallmart Agency, Inc. wrote crop-hail insurance policies from private insurance companies such as ARMtech Insurance Services, for various farmers.

p.    A co-conspiring insurance agent then instructed a co-conspirator/adjuster to exaggerate the loss amount on the Proof of Loss in connection with crop-hail claims.  A co-conspiring insurance agent and the co-conspirator then would execute Proof of Loss form, knowing that the loss amounts were exaggerated.

12

q. With both the multi-peril crop insurance claims and the crop-hail claims, a co-conspirator would either mail or caused to be mailed, through the U.S. mails, the claim forms, or would submit the claim forms by electronic mail.

r. Co-conspiring agents received commissions on the fraudulent claims.

s. For the 2005 and 2006 seasons, The Hallmart Agency, Inc. filed $11,749,594 worth of loss claims on behalf of its insureds.

t. At the end of the year, a co-conspiring agent, by and through The Hallmart Agency, Inc., would pay co-conspirators out of the operating accounts of The Hallmart Agency and from funds received in connection with fraudulent crop insurance claims.

u. MARK DAVIS PRIDGEN, defendant herein, received the payment for his role in the filing of false crop insurance claims through payments to Tobacco Insurance Agency, Inc. and International Insurance & Properties, LLC. and cash payments.

OVERT ACTS

31. In furtherance of the conspiracy, and to effect the object thereof, there were committed by at least one of the co-conspirators in the Eastern District of North Carolina at least one of the following overt acts, among others:

a.     On or about December 19, 2003, The Hallmart Agency, Inc., by and through a co-conspirator, issued a check to Tobacco Insurance Agency, Inc. in the amount of $95,477.02.

b.     On or about December 22, 2004, The Hallmart Agency, Inc., by and through a co-conspirator, issued a check to Tobacco Insurance Agency, Inc. in the amount of $90,564.78.

c.     On or about December 22, 2004, The Hallmart Agency, Inc., by and through a co-conspirator, issued a check to International Insurance & Properties, LLC in the amount of $18,500.

d.     Between on or about August 10, 2005 and October 24, 2005, MARK DAVIS PRIDGEN, defendant herein, sold hidden tobacco using the name of another co-conspirator farmer who, in fact, had not grown any tobacco at all.

e.     During 2005, and as a result of the sale of hidden tobacco, MARK DAVIS PRIDGEN and the co-conspirators caused a tobacco company to issue checks totaling $103,633.06 as follows:

| Date of Check | Amount |
|---------------|--------|
| 08/10/2005 | $9,413.82 |
| 08/11/2005 | $9,596.95 |
| 08/12/2005 | $9,429.08 |
| 08/18/2005 | $5,293.71 |
| 08/19/2005 | $5,123.99 |
| 08/23/2005 | $5,166.85 |
| 08/25/2005 | $1,790.96 |
| 09/07/2005 | $4,568.18 |

14

| | |
|---|---|
| 09/07/2005 | $3,548.91 |
| 09/19/2005 | $7,178.13 |
| 09/20/2005 | $5,867.67 |
| 09/20/2005 | $3,638.06 |
| 09/22/2005 | $1,055.06 |
| 09/27/2005 | $9,087.50 |
| 09/29/2005 | $7,403.43 |
| 10/04/2005 | $4,950.70 |
| 10/24/2005 | $9,627.34 |
| 10/24/2005 | $892.72 |

f.  On or about December 21, 2005, The Hallmart Agency, Inc., by and through a co-conspirator, issued a check to Tobacco Insurance Agency, Inc. in the amount of $85,151.67.

g.  On or about December 21, 2005, The Hallmart Agency, Inc., by and through a co-conspirator, issued a check to International Insurance & Properties, LLC. in the amount of $10,000.

h.  Between on or about August 14, 2006, and October 25, 2006, MARK DAVIS PRIDGEN, defendant herein, sold hidden tobacco using the name of another co-conspirator farmer who, in fact, had not grown any tobacco at all.

i.  During 2006, and as a result of the sale of hidden tobacco, MARK DAVIS PRIDGEN and the co-conspirators caused a tobacco company to issue checks totaling $100,100.22 as follows:

15

| Date of Check | Amount |
|---|---|
| 08/14/2006 | $4,270.52 |
| 08/14/2006 | $1,491.92 |
| 08/14/2006 | $5,832.51 |
| 08/22/2006 | $5,667.64 |
| 08/28/2006 | $3,393.22 |
| 08/30/2006 | $3,079.10 |
| 09/07/2006 | $4,882.05 |
| 09/11/2006 | $8,778.38 |
| 09/19/2006 | $1,665.35 |
| 09/21/2006 | $8,344.15 |
| 09/21/2006 | $8,310.21 |
| 09/25/2006 | $3,652.53 |
| 09/25/2006 | $2,413.14 |
| 09/26/2006 | $7,722.98 |
| 09/27/2006 | $4,837.88 |
| 10/04/2006 | $1,368.66 |
| 10/10/2006 | $8,170.65 |
| 10/24/2006 | $3,993.98 |
| 10/24/2006 | $1,399.95 |
| 10/24/2006 | $8,218.40 |
| 10/25/2006 | $2,607.00 |

j.    During 2006, and in order to hide the sale of hidden tobacco, MARK DAVIS PRIDGEN and the co-conspirators caused some of the tobacco checks issued above to be cashed through The Hallmart Agency, Inc. as follows:

16

| Date of Check | Amount |
|---------------|------------|
| 08/14/2006 | $4,270.52 |
| 08/14/2006 | $1,491.92 |
| 08/14/2006 | $5,832.51 |
| 08/22/2006 | $5,667.64 |
| 08/28/2006 | $3,393.22 |
| 09/19/2006 | $1,665.35 |
| 09/25/2006 | $3,652.53 |
| 09/25/2006 | $2,413.14 |
| 09/26/2006 | $7,722.98 |
| 09/27/2006 | $4,837.88 |
| 10/04/2006 | $1,368.66 |

k.    Sometime in 2006, MARK DAVIS PRIDGEN, defendant
herein, and a co-conspiring agent approached a cooperating witness
and asked the cooperating witness to secure a tobacco contract
under which the conspirators would sell hidden tobacco.    At the
time of the contact, both MARK DAVIS PRIDGEN, defendant herein, and
the co-conspiring agent knew that the cooperating witness did not
grow tobacco.

l.    Between on or about September 25, 2006, and October
17, 2006, MARK DAVIS PRIDGEN, defendant herein, and other co-
conspirators sold hidden tobacco using the name of a cooperating
witness who, in fact, had not grown any tobacco at all.

m.    During 2006, and as a result of the sale of hidden
tobacco set forth above, MARK DAVIS PRIDGEN and the co-conspirators

17

caused a tobacco company to issue checks totaling $130,450.07 as follows:

| Date of Check | Amount |
|---------------|--------------|
| 09/25/2006 | $9,044.69 |
| 09/26/2006 | $4,973.62 |
| 09/26/2006 | $8,379.47 |
| 09/28/2006 | $6,817.80 |
| 09/28/2006 | $7,061.78 |
| 10/02/2006 | $8,099.71 |
| 10/03/2006 | $8,968.00 |
| 10/03/2006 | $7,458.12 |
| 10/03/2006 | $8,189.12 |
| 10/05/2006 | $9,352.13 |
| 10/10/2006 | $9,307.81 |
| 10/10/2006 | $6,071.28 |
| 10/11/2006 | $9,185.42 |
| 10/11/2006 | $9,407.50 |
| 10/12/2006 | $9,517.42 |
| 10/17/2006 | $8,616.20 |

n.    On or about September 11, 2006, MARK DAVIS PRIDGEN, defendant herein, and other conspirators weighed hidden tobacco in an effort to keep the payments under $10,000.

o.    On or about October 4, 2006, MARK DAVIS PRIDGEN, defendant herein, and  a co-conspiring agent discuss the various monetary successes of a co-conspiring warehouseman.

18

p.    On or about October 17, 2006, MARK DAVIS PRIDGEN, defendant herein, met with a co-conspiring insurance agent and another person, and received cash obtained through the sale of hidden tobacco.

q.    On or about December 28, 2006, The Hallmart Agency, Inc., by and through a co-conspirator, issued a check to Tobacco Insurance Agency, Inc. in the amount of $130,097.10.

All in violation of Title 18, United States Code, Section 371.

COUNT TWO
*Conspiracy to Commit Money Laundering*
*18 U.S.C. § 1956(h)*

1.    Paragraphs One through Twenty-Seven of Count One above are hereby re-alleged and incorporated by reference.

2.    Beginning on or about December 19, 2003, the exact date being unknown, and continuing up to and including December 15, 2008, within the Eastern District of North Carolina, defendant herein, MARK DAVIS PRIDGEN, did combine, conspire, confederate and agree with others known and unknown to the United States Attorney to commit the following offenses against the United States:

a.    to knowingly conduct a financial transaction affecting interstate and foreign commerce which in fact involved the proceeds of specified unlawful activity, specifically, violations of 18 U.S.C. § 1014, 18 U.S.C. § 1341, and 18 U.S.C. § 1343, with the intent to promote the carrying on of specified unlawful activity and knowing the financial transaction involved the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and

19

b.  to knowingly engage in a monetary transaction
        within the United States in criminally derived
        property with a value greater than $10,000, which
        was in fact derived from a specified unlawful
        activity, specifically, violations of 18 U.S.C. §
        1014, 18 U.S.C. § 1341, and 18 U.S.C. § 1343, in
        and affecting interstate and foreign commerce, in
        violation of 18 U.S.C. § 1957.

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE NOTICE

The defendant is given notice of the provisions of 18 U.S.C. Section 981(a)(1)(C), as made applicable by Title 28, United States Code, Section 2461, and 18 U.S.C. § 982 that all of their interest in all property specified herein is subject to forfeiture.

As a result of the foregoing offenses as alleged in this criminal information, the defendant shall forfeit to the United States any and all property constituting, or derived from, any proceeds the said defendant obtained directly or indirectly as a result of the said offenses and, in addition, shall forfeit to the United States any property involved in the offense stated in Counts One and Two of this criminal information.

The forfeitable property includes, but is not limited to:

(1) personal property;

(2) real property; and

(3) currency in the amount of $647,139, representing the gross proceeds of offenses stated in this criminal information.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant,

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property. Such substitute property shall include but not be limited to: any and all commissions on all property and liability insurance sold by name of any company, with him acting as a sub-agent, and to be received by MARK DAVIS PRIDGEN and/or his wife pursuant to any sale agreements involving any book of crop insurance business belonging to himself or his wife.

All in accordance with 18 U.S.C. §§ 981 and 982.

GEORGE E. B. HOLDING
United States Attorney

BY: BANUMATHI RANGARAJAN
Assistant United States Attorney
Criminal Division

21